UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| STEPHEN EIMERS, | ) | |
|---|---|---|
| | ) | Case No. 1:19-cv-44 |
| *Plaintiff*, | ) | |
| | ) | Judge Travis R. McDonough |
| v. | ) | |
| | ) | Magistrate Judge Christopher H. Steger |
| LINDSAY CORPORATION, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

**ORDER**

Before the Court is Plaintiff Stephen Eimers's motion for reconsideration of the Court's grant of summary judgment regarding punitive damages (Doc. 287). After initial briefing on this motion, the Court ordered the parties to file supplemental briefs to address whether Eimers waived his argument regarding punitive damages by failing to raise it in summary-judgment briefing, whether the crash-testing standards at issue were actually required in any federal or state regulation, and whether new evidence would support a finding that Lindsay did not comply with those crash-testing standards. (Doc. 321, at 13.) For the following reasons, the Court will **GRANT** Eimers's motion for reconsideration (Doc. 287) and **REVERSE** its previous ruling dismissing Eimers's punitive-damages claim (Doc. 269, at 57–58).

**I.   STANDARD OF LAW**

Federal Rule of Civil Procedure 54(b) provides, in pertinent part:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

"Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (citation omitted); *cf. Shah v. NXP Semiconductors USA, Inc.*, 507 F. App'x 483, 495 (6th Cir. 2012) (noting that motions for reconsideration cannot be used to raise new legal arguments that could have been raised before).

## II. BACKGROUND[1]

At summary judgment, the Court based its decision to dismiss the punitive-damages claim on Tennessee Code Annotated § 29-39-104(e), which bars punitive damages when a defendant demonstrates it was in "substantial compliance with applicable federal and state regulations setting forth specific standards applicable to the activity in question." The Court held that this statute applied to bar punitive damages in this case because "Plaintiff acknowledges, as he must, that the X-LITE did pass its crash tests and was approved by the [Federal Highway Administration], even if it was only 'technically passing a bare minimum crash test (with disturbing interpretations and submissions of those test results).'" (Doc. 269, at 58 (quoting Doc. 257, at 16–17).)

Eimers now argues that the crash-testing criteria the Federal Highway Administration ("FHWA") required that the X-LITE meet before issuing an "approval letter" for the product was not a federal regulation, and that the Tennessee Department of Transportation's ("TDOT") requirement that a product receive the FHWA approval letter before it would be included on its Qualified Products List ("QPL") was not a state regulation. (Doc. 288, at 5–8; Doc. 223-3, at 92

---

[1] The Court incorporates its statement of the facts in its order on Lindsay's motion for summary judgment for purposes of this motion for reconsideration. (*Id.* at 2–6.)

("The purpose of the Qualified Products List is to make available to Construction and Maintenance personnel a list of products which perform satisfactorily. Inclusion on the QPL must not be considered as prior approval, and in no way precludes Departmental testing and approval requirements. Products on the QPL are products which have been evaluated and found that they could be acceptable for use, provided all testing and/or certification requirements have been met and provided the products are used in accordance with the manufacturer's recommendations."); Doc. 341-1.) Based on these arguments, the Court ordered Eimers to submit a supplemental brief regarding why he did not waive this argument by failing to raise it in response to Lindsay's motion for summary judgment. (Doc. 321, at 13.) Lindsay, in its initial response to Eimers's motion for reconsideration, asserted that the crash-testing criteria were "mandatory safety standard[s]" required by both the FHWA and the TDOT but cited no regulations from these agencies that required crash testing. (Doc. 290, at 6–9.) Therefore, the Court also ordered Lindsay to file a supplemental brief identifying which regulation, promulgated through notice-and-comment procedures at the federal level, or equivalent procedures at the state level, set forth applicable crash-testing standards. (Doc. 321, at 13.) The parties have now filed their supplemental briefs, and Eimers's motion for reconsideration is ripe for the Court's review. (Docs. 326–27.)

### III.  ANALYSIS

Tennessee Code Annotated § 29-39-104(e) (hereinafter, "§ 104(e)") provides:

> Punitive damages shall not be awarded in any civil action when a defendant demonstrates by a preponderance of the evidence that it was in substantial compliance with applicable federal and state regulations setting forth specific standards applicable to the activity in question and intended to protect a class of persons or entities that includes the plaintiff, if those regulations were in effect at the time the activity occurred.

3

The Court dismissed Eimers's punitive-damages claim because Eimers acknowledged that the X-LITE passed its crash tests and was approved by the FHWA. (Doc. 269, at 57–58.) Implicit in this conclusion was that the crash-testing standards required for approval by the FHWA were regulatory standards within the meaning of § 104(e). But the Court did not explicitly consider whether the crash-testing standards, which were developed by the National Cooperative Highway Research Program 350 Report ("NCHRP 350"), were, in fact, regulatory standards, because Eimers did not raise this argument. Instead, he only argued that Lindsay did not substantially comply with the crash-testing standards.[2] However, Eimers's motion for reconsideration and the parties' supplemental briefs clarified that the assumption that the FHWA regulations required compliance with the standards of crashworthiness under the NCHRP 350 was a clear error of law.

### A. No Federal Regulation Imposed the Specific Standards of NCHRP 350

Section 104(e) does not bar punitive damages in this case. Federal regulations imposed no specific crash-testing standards; NCHRP 350 was merely guidance or policy.

FHWA's reliance on the NCHRP 350 arose out of the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"). In this statute, Congress required the FHWA to promulgate a regulation establishing standards to ensure the crashworthiness of guardrail end terminals to be installed on the national highway system:

---

[2] Lindsay argues that the Court should not reconsider its prior decision because Eimers waived the argument that the standards were not regulations. The Court will not rest its decision on waiver, because, as the Court will find, its prior decision was based on a clear error of law. *See* Section III.A.–B., *infra*. Allowing the previous decision to stand on the basis of waiver alone would result in manifest injustice. Additionally, Eimers did raise at summary judgment that the FHWA only mandated compliance with the crash-testing standards at issue through guidance, rather than regulation. (See Doc. 257, at 24–28.) The Court did not consider this argument on the punitive-damages issue, because Eimers raised it in response to Lindsay's federal-preemption argument.

4

> **(a) Initiation of rulemaking proceeding.**--Not later than 30 days after the date of the enactment of this Act [Dec. 18, 1991], the Secretary shall initiate a rulemaking proceeding to revise the guidelines and **establish standards for installation of roadside barriers** and other safety appurtenances, including longitudinal barriers, end terminals, and crash cushions. Such rulemaking shall reflect state-of-the-art designs, testing, and evaluation criteria contained in the National Cooperative Highway Research Program Report 230, relating to approval standards which provide an enhanced level of crashworthy performance to accommodate vans, mini-vans, pickup trucks, and 4-wheel drive vehicles.
>
> **(b) Final rule.**--Not later than 1 year after the date of the enactment of this Act [Dec. 18, 1991], the Secretary shall complete the rulemaking proceeding initiated under subsection (a), and issue a final rule regarding the implementation of revised guidelines and standards for acceptable roadside barriers and other safety appurtenances, including longitudinal barriers, end terminals, and crash cushions. Such revised guidelines and standards shall accommodate vans, mini-vans, pickup trucks, and 4-wheel drive vehicles and shall be applicable to the refurbishment and replacement of existing roadside barriers and safety appurtenances as well as to the installation of new roadside barriers and safety appurtenances.

Intermodal Surface Transportation Efficiency Act of 1991, Pub. L. No. 102–240, § 1073, 105 Stat. 1914 (1991) (emphasis added). The FHWA undertook a formal rulemaking process, as prescribed in the ISTEA, which resulted in a final rule in 1993. The rule provided, in part:

> (a) Plans and specifications for proposed Federal-aid highway projects shall provide for a facility that will—
>
>> (1) Adequately meet the existing and probable future traffic needs and conditions in a manner conducive to safety, durability, and economy of maintenance; and
>>
>> (2) Be designed and constructed in accordance with standards best suited to accomplish the foregoing objectives and to conform to the particular needs of each locality.

23 C.F.R. § 625.2(a) (1994 version). This rule has remained largely unchanged. 23 C.F.R. § 625.2(a) (current) ("Plans and specifications for proposed National Highway System (NHS) projects shall provide for a facility that will—(1) Adequately serve the existing and planned future traffic of the highway in a manner that is conducive to safety, durability, and economy of maintenance; and (2) Be designed and constructed in accordance with criteria best suited to

5

accomplish the objectives described in paragraph (a)(1) of this section and to conform to the particular needs of each locality.").

At the time the rule was first promulgated, it also contained a section entitled "Guides and references," and referenced "citations to publications which are primarily informational or guidance in character and serve to assist the public in knowing those materials which are considered by FHWA to provide valuable information in attaining good design." 23 C.F.R. § 625.5 (1994 version). The "guides and references" section explicitly involved the NCHRP 350:

> The following are citations to publications which are primarily informational or guidance in character and serve to assist the public in knowing those materials which are considered by FHWA to provide valuable information in attaining good design [as required by 23 C.F.R. § 625.2(a)].
>
> (a) Roadway and appurtenances.
> . . .
>
> (13) National Cooperative Highway Research Program Report 350, Recommended Procedures for the Safety Performance Evaluation of Highway Features, TRB 1993.

23 C.F.R. § 625.5 (1994 version). In 1997, the "guides and references" section was removed from the regulation, and the FHWA moved the previously-cited standards, including the NCHRP 350, to a "Non-Regulatory Supplement to the Federal-Aid Policy Guide, Subchapter G, Part 625 (NS CFR 625)." (*See* Doc. 327-3, at 2.)

When the NCHRP 350 standards were moved to the non-regulatory supplement, the FHWA issued a policy memorandum (the "1997 Memorandum"). The 1997 Memorandum stated that, to comply with 23 C.F.R. § 625.2(a), "all new or replacement safety features on the NHS covered by the guidelines in the NCHRP Report 350 . . . are to have been tested and evaluated and found acceptable in accordance with the guidelines in the NCHRP Report 350." Memorandum: Identifying Acceptable Highway Safety Features, from FHWA Eng'g Off. to

6

Reg'l Adm'rs, Fed. Lands Highway Program Adm'r, Div. Adm'rs, and Fed. Lands Highway Div. Eng'rs (July 25, 1997) (on file with FHWA), https://www.fhwa.dot.gov/legsregs/directives/policy/ra.htm (last accessed May 16, 2022).  The effect of the 1997 Memorandum was to require all highway-safety installations, including guardrail end terminals, to meet the standards in the NCHRP 350 in order for the FHWA to find that the product would "[a]dequately serve the existing and planned future traffic of the highway in a manner that is conducive to safety, durability, and economy of maintenance."  23 C.F.R. § 625.2(a) (current).  The FHWA issues approval letters as a voluntary service to states to indicate it has reviewed a product's crash tests and found it to be eligible for federal-aid reimbursement under its policies.  (Doc. 258-7, at 51–54 ("Federal-aid reimbursement eligibility letters from FHWA are not required for a State DOT to install the device on any road and are not required for the State DOT to receive Federal-aid reimbursement for that device. The FHWA issues these letters as a service to the State DOTs. . . . Issuance of a Federal-aid reimbursement eligibility letter by FHWA does not ensure acceptance or use by any State Department of Transportation (State DOT).  Each State DOT may choose not to purchase and install a specific device, or may place additional limits upon use of a device."); *see* Doc. 288-1, at 14); Memorandum: Evaluating a State DOT's Process to Determine Roadside Safety Hardware Crashworthiness on the National Highway System (April 9, 2018) (on file with FHWA), https://safety.fhwa.dot.gov/roadway_dept/countermeasures/reduce_crash_severity/docs/memo040918.pdf  (last access May 27, 2022) ("The FHWA continues to provide a voluntary service of reviewing crash test results and issues eligibility letters for new roadside safety hardware . . . . An eligibility letter is not a requirement for roadside safety hardware to be determined eligible for Federal funding.  Roadside safety hardware is eligible for Federal funding if it has been

7

determined to be crashworthy by the user agency (i.e., State DOT).").  But FHWA instructs states they should not rely on such aid-reimbursement eligibility letters to determine whether a product is safe:  "An FHWA eligibility letter should not be the sole basis for a State's determination of crashworthiness.  It is each State's responsibility to determine crashworthiness and to approve new or modified roadside safety hardware meeting the State's specific needs."  Memorandum: Evaluating a State DOT's Process to Determine Roadside Safety Hardware Crashworthiness on the National Highway System (April 9, 2018) (on file with FHWA),https://safety.fhwa.dot.gov/roadway_dept/countermeasures/reduce_crash_severity/docs/memo040918.pdf  (last access May 27, 2022).  The policy position stated in the 1997 Memorandum was FHWA's official policy on compliance with § 625.2(a) at all times relevant to this litigation and remained the official policy until 2015.  *See* Memorandum: Fed.-Aid Reimbursement Eligibility Process for Safety Hardware Devices, from FHWA Off. of Safety Techs. to Reg'l Adm'rs, Dirs. of Field Servs., and Fed. Lands Highway Div. Eng'rs (Nov. 12, 2015) (on file with FHWA), https://safety.fhwa.dot.gov/roadway_dept/countermeasures/reduce_crash_severity/policy_memo/memo111215/ (last access May 16, 2022).

It was only FHWA *policy* to require these crash-testing standards; the NCHRP 350 was non-binding *guidance* for how the FHWA should interpret the regulation requiring safety installations to be "conducive to safety."  *See* 23 C.F.R. § 625.2(a) (current).  "Statements made by federal agencies may constitute substantive rules or merely be general policy statements.  Agencies are bound by duly promulgated substantive rules, which have the force of law, while interpretive rules or policy statements do not have binding effect."  *Dyer v. Sec'y of Health & Hum. Servs.*, 889 F.2d 682, 685 (6th Cir. 1989) (citing *Chrysler Corp. v. Brown,* 441 U.S. 281,

301–302 (1979); *Vietnam Veterans of Am. v. Sec'y of the Navy,* 843 F.2d 528, 537 (D.C. Cir. 1988); *Iowa Power & Light Co. v. Burlington N., Inc.,* 647 F.2d 796, 811 (8th Cir. 1981), *cert. denied,* 455 U.S. 907 (1982)) (internal citation omitted). An agency creates a regulation when it duly promulgates a rule, in accordance with the procedures in the Administrative Procedures Act, in which it "implements a statute by enacting a legislative-type rule affecting individual rights and obligations" and/or "narrowly circumscribes administrative discretion in all future cases . . . finally and conclusively determine[ing] the issues to which it relates." *Id.* (citing *Chrysler,* 441 U.S. at 301–302). A policy statement, on the other hand, "is a pronouncement that simply advises the public what the agency's prospective position on an issue is likely to be." *Id.*

Tennessee law requires the Court to "determine legislative intent from the natural, ordinary meaning of the statutory language, and, when the statutory language is clear and unambiguous, we must apply its plain meaning in its normal and accepted use." *Grant v. Kia Motors Corp.*, 185 F. Supp. 3d 1033, 1051 (E.D. Tenn. 2016) (quoting *In re Angela E.*, 303 S.W.3d 240, 246 (Tenn. 2010)). The plain meaning of § 104(e) allows the application of the bar on punitive damages only when a party has complied with a *regulation*; it does not apply to compliance with standards in non-binding federal *guidance*, like the 1997 Memorandum or the *Non-Regulatory* Supplement to the Federal-Aid Policy Guide. *See* Tenn. Code. Ann. § 29-39-104(e); *Dyer*, 889 F.2d at 685.

This conclusion is further supported by the fact that the FHWA has promulgated a regulation setting forth specific standards for crash testing of other highway safety products but excluded the NCHRP 350 standards for guardrail end terminals. *See* 23 C.F.R. § 625.4. That regulation, entitled "Design Standards for Highways," enumerates specific standards with which roadways, appurtenances, and bridges must comply. *Id.*; 23 C.F.R. § 625.3 ("The standards,

policies, and standard specifications cited in § 625.4 of this part contain specific criteria and controls for the design of NHS projects."). The regulation establishes standards largely through incorporation by reference of industry reports and policy guides similar to the NCHRP 350, but the list of incorporated materials does not include the NCHRP 350. 23 C.F.R. § 625.4. The FHWA did not adopt a regulation imposing the standards of NCHRP 350. Without such a regulation, §104(e) does not apply.

To the extent that there is an FHWA regulation at work here, it did not set forth any specific standard as § 104(e) requires. The X-LITE's FHWA approval letter established that the agency found the guardrail system in compliance with 23 C.F.R. § 625.2(a) under the guidelines with which FHWA interpreted that regulation. But that regulation only generally required the product to be "conducive to safety." 23 C.F.R. § 625.2(a). Section 104(e) requires compliance with a regulation "setting forth *specific* standards" before it bars punitive damages. (Emphasis added.) The unambiguous, plain meaning of § 104(e) does not give a party the benefit of the bar on punitive damages when it has merely complied with a federal regulation setting forth a *general* standard like "conducive to safety." *See Grant*, 185 F. Supp. 3d at 1051; 23 C.F.R. 625.2(a). And it does not provide a bar when a product complies with anything less than a regulation. Lindsay is not entitled to the bar on punitive damages.

    **B.**  **No State Regulation Imposed the Specific Standards of NCHRP 350.**

Lindsay next argues that, even if it did not comply with a federal regulation setting forth specific standards, it is still entitled to the statutory punitive-damages bar because Tennessee state regulations required that products included on TDOT's QPL meet the NCHRP 350 standards. (Doc. 327, at 11–15.) TDOT is "responsible for the maintenance of . . . public roads, streets, highways or bridges and similar structures that are designated by the department

as being on the state system of highways or the state system of interstate highways." Tenn. Code Ann. § 54-1-126(a). TDOT "has full power, and it is made its duty . . . to cooperate with the federal government . . . in the selection and erection of . . . safety devices for the protection and direction of traffic on those highways." Tenn. Code Ann. § 54-5-108 (emphasis added); *see also Austin v. State*, 796 S.W.2d 449, 455 (Tenn. 1990) ("The ultimate responsibility for the inspection and maintenance of [a bridge] was upon the Tennessee Department of Transportation under both federal and state law."). TDOT's QPL explicitly states that "[a]ll guardrail end terminals specified on TDOT projects must be accepted as crashworthy by the FHWA in accordance with either NCHRP Report 350 or the AASHTO Manual for Assessing Safety Hardware (MASH) for Test Level 3 (TL-3)." *See* Doc. 223-3, at 364.

But, as with the federal regulations, at the state level, there is no state "regulation[] setting forth specific standards" that "safety devices" comply with the NCHRP 350. The TDOT requirement stated in the QPL that guardrail end terminals must be accepted as crashworthy under the NCHRP 350 was not a regulation promulgated by TDOT and entered into the Tennessee Administrative Code—even though TDOT had the authority to adopt such a regulation. It was merely TDOT's the *policy or practice* to require compliance with the NCHRP 350 standards as the means by which it fulfilled its statutory duty to "select[] and erect[] . . . safety devices for the protection and direction of traffic on [] highways." Tenn. Code Ann. § 54-5-108(a)(1); (*see* Doc. 223-3, at 92 (TDOT's foreword to the QPL announcing that inclusion on the list was nonbinding, did not carry the force of legislation, and did not circumscribe agency discretion; "Inclusion on the QPL must not be considered as prior approval, and in no way precludes Departmental testing and approval requirements.")). This statute does not set forth "specific standards," and there is no regulation in the Tennessee Administrative Code outlining

or incorporating "specific standards" by which highway safety devices should be crash tested. *See* Tenn. Code. Ann. § 29-39-104(e). Accordingly, Lindsay has not shown it complied with any "*state regulations setting forth specific standards* applicable to the activity in question and intended to protect a class of persons or entities that includes the plaintiff." *Id.* (emphasis added). Therefore, the statutory bar on punitive damages does not apply in this case.[3]

### C. Whether Defendant Acted Recklessly

Because the Court has concluded that § 104(e) does not apply, the Court must consider whether Eimers's punitive-damages claim can survive summary judgment under the general standard for punitive damages in the Tennessee Products Liability Act ("TPLA"). *See* Tenn. Code Ann. § 29-28-104. The TPLA provides that "[p]unitive damages may only be awarded if the claimant proves by clear and convincing evidence that the defendant against whom punitive damages are sought acted maliciously, intentionally, fraudulently or recklessly." *Id.*; Tenn. Code Ann. § 29-39-104(a)(1). Therefore, a punitive-damages claim may only survive summary judgment when "the evidence and the inferences reasonably drawn from the evidence are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity that the defendant's conduct that caused the plaintiff's injury was intentional, fraudulent, malicious, or reckless. *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 207 (Tenn. Ct. App. 2008) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992)). "A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable

---

[3] Eimers also raises new evidence, in the alternative, to support his contention that even if the NCHRP 350 were a regulatory standard, there is at least a question of fact as to whether it "was in substantial compliance" with the standard. (*See* Doc. 288, at 9–17.) Because the Court now concludes that the NCHRP 350 is not a federal or state regulatory standard within the meaning of § 29-39-104(e), it will not consider this alternative argument.

risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Hodges*, 833 S.W.2d at 901.

Eimers contends that Lindsay acted recklessly because it was aware the "X-LITE end terminal was defective and prone to causing life-threatening injuries" and disregarded this risk by not communicating failed crash tests to TDOT. (Doc. 257, at 16.) In support of this contention, Eimers presented evidence, including handwritten notes from Lindsay's Vice President of Engineering at the time, Gerrit Dyke, detailing several failed crash tests, even as measured under the minimum standards in the NCHRP 350, both before and after the X-LITE was approved by the FHWA. (Doc. 258-5, at 24–26.) Eimers also presented evidence that Lindsay performed structural-design changes on the X-LITE without formally documenting them, informing FHWA or TDOT of those changes, or re-testing the system after such changes were made. (Doc. 258-5, at 86–92.) These changes included increasing the impact-head height, adding shear bolts, changing the slot-post hold, and adding blockout. (*Id.* at 87.) Additionally, Lindsay conducted a field audit of X-LITE installations, which revealed ninety percent of the installations were improper, but thereafter did not aggressively promote training contractors in proper installation methods. (Doc. 223-1, at 81, 116.) Further, TDOT's corporate representative testified that Lindsay did not communicate to TDOT the existence of failed test results, the ninety-percent-installation-failure rate, the fact that Lindsay had no performance data for the X-LITE in collisions occurring at over 62.5 miles per hour, nor the fact the Virginia and South Carolina Departments of Transportation were removing the X-LITE from their qualified products lists over safety concerns. (Doc. 241-7.) He also testified that he would have expected or hoped that Lindsay would disclose all of this information to TDOT, and, if it had, it would

have influenced TDOT's decision to allow the X-LITE to be installed on Tennessee roadways. (Doc. 241-7, at 15–16.)

Additionally, in one crash test, referred to as XLT15, the accelerometers in the vehicle measured ride-down accelerations as 32-g-force, which is a deadly rate. (Doc. 288-18.) Lindsay nonetheless contends that this was not a failed test because the accelerometers were improperly calibrated or not functioning which resulted in this high measurement. (Doc. 327, at 21.) Lindsay ran video software to independently measure the g-forces, which revealed some of the accelerometer data was faulty, but the independent measure also *confirmed* that the g-forces still exceeded the safe 20-g-force threshold. (Doc. 288-20.) XLT15 also revealed that when the X-LITE system's impact head separated horizontally from the w-beam guardrail, the car would be exposed to a blunt end of a guardrail—which could allow the guardrail to spear the vehicle and injure occupants. (Doc. 288, at 13.)

Dyke averred that "there has never been an obligation to disclose the results of every single crash test to obtain approval [from the FHWA]." (Doc. 327-8, at 3.) Therefore, Lindsay argues, any crash test that Eimers contends put Lindsay on notice that the X-LITE had a dangerous propensity to spear vehicles or otherwise cause injury is irrelevant to the analysis of availability of punitive damages. (Doc. 327, at 20–21.) This would be the case if, to obtain approval from the FHWA, Lindsay complied with a regulation setting forth specific crash-testing standards, but the Court has now found that no such regulation existed. *See* Section III.A.–B., *supra*. Therefore, the Court must analyze the punitive-damages claim under the recklessness standard, *i.e.*, whether Lindsay knew of a substantial risk and consciously disregarded it, regardless of whether it was complying with the NCHRP 350. Taking all of the evidence discussed in this section together, a reasonable jury could find that Eimers established with

14

convincing clarity that Lindsay was aware of, but consciously disregarded, a substantial and unjustifiable risk that the X-LITE could cause severe injuries such that its disregard constituted a gross deviation from the standard of care that an ordinary person would exercise under the circumstances. *See Hodges*, 833 S.W.2d at 901.

## IV. CONCLUSION

For these reasons, the Court **GRANTS** Eimers's motion for reconsideration (Doc. 287) and Eimers and **REVERSES** its previous order dismissing Eimers's punitive-damages claim (Doc. 269, at 57–58). In accordance with Tenn. Code Ann. § 29-39-104(a)(2)–(3) the trial **SHALL** be conducted in a bifurcated proceeding.

**SO ORDERED.**

/s/ *Travis R. McDonough*
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**