# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

STEPHEN EIMERS,           )

             )      Case No. 1:19-cv-44

       *Plaintiff*,      )

             )      Judge Travis R. McDonough

v.                )

             )      Magistrate Judge Christopher H. Steger

LINDSAY CORPORATION, *et al.*,   )

             )

      *Defendants*.     )

             )

---

### ORDER

---

Before the Court are the parties' motions in limine (Docs. 329–32) and Plaintiff Stephen Eimers's motion for an adverse instruction against Defendants. (Doc. 338.) In this case, Eimers asserts products-liability claims for negligent design and failure to warn against Defendants Lindsay Corporation and Lindsay Transportation Solution Sales & Services, LLC *f/k/a* Barrier Systems, Inc. (collectively, "Lindsay"), pursuant to the Tennessee Products Liability Act ("TPLA"), Tenn. Code Ann. § 29-28-101, *et seq.* (*See* Doc. 127.) The claims arise out of a car crash on Interstate 75 on November 1, 2016. Hannah Eimers, Plaintiff's daughter, was driving a 2000 Volvo S80 north on Interstate 75 near mile marker 55.90 in McMinn County, Tennessee. (Doc. 223-1, at 146.) The Volvo left the roadway, began a clockwise yaw, and collided with the guardrail end terminal at mile marker 56 ("subject guardrail"). (*Id.*) As a result of the collision, part of the subject guardrail and/or end terminal penetrated the driver-side door, entered the occupant compartment, and severely injured Hannah Eimers, resulting in her death. (*Id.* at 147; Doc. 127, at 13.) Eimers contends that the subject guardrail was an X-LITE guardrail system, manufactured and sold by Lindsay. (Doc. 127, at 6.) On May 31, 2022, the Court conducted a

final pretrial conference. Based on the parties' briefs and arguments made during the final

pretrial conference, the Court rules as follows:

## I. MOTION FOR AN ADVERSE INSTRUCTION

Eimers moved for an adverse instruction as a sanction for the "intentional concealment

and withholding of relevant documents" by Lindsay. (Doc. 339, at 1 (cleaned up).) This dispute

relates to more than 2,000 pages in Lindsay's document production which are blank and state,

"This page is intentionally left blank." (*Id.* at 2.) Counsel for Eimers compared Lindsay's

document production in this case to its document production in other lawsuits arising out of

collisions with X-LITE guardrail systems and discovered that the "intentionally left blank" pages

do not match up—in Lindsay's production for *Eimers*, a page may read "intentionally left blank"

while the same page in Lindsay's production for another case contains an actual document. (*Id.*

at 3–4.)

> In the Sixth Circuit,
>
> A district court may sanction a litigant for spoliation of evidence if three
> conditions are met. First, the party with control over the evidence must have had
> an obligation to preserve it at the time it was destroyed. Second, the accused
> party must have destroyed the evidence with a culpable state of mind. And third,
> the destroyed evidence must be relevant to the other side's claim or defense. The
> party seeking the sanction bears the burden of proof in establishing these facts.

*Byrd v. Alpha All. Ins. Corp.*, 518 F. App'x 380, 383–84 (6th Cir. 2013) (citing *Beaven v. U.S.*

*Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010)) (internal citations omitted). Eimers has not

met his burden to establish that the Court should sanction Lindsay for spoliation of evidence.

First, redacting arguably irrelevant and/or confidential pages, even if they were intentionally

concealed does not constitute destruction of the evidence. *Applebaum v. Target Corp.*, 831 F.3d

740, 744 (6th Cir. 2016) ("When a party destroys evidence in anticipation of litigation, the trial

court may impose sanctions for spoliation.") (citing *Adkins v. Wolever*, 554 F.3d 650, 651 (6th

Cir. 2009) (en banc)).  Further, even assuming concealment could be construed as destruction, Eimers has not established that Lindsay concealed the evidence with a culpable state of mind— only conclusory, exaggerated assertions of intent.  (*See e.g.,* Doc. 339, at 7 ("Defendants' culpable state of mind can be inferred from the fact that the concealed documents are labeled 'INTENTIONALLY LEFT BLANK' and from the fact that Lindsay not only knew it was concealing documents, but deliberately hid and obscured -- and continues to conceal -- more than 2,000 pages of documents. This was not done accidentally. It was not a mistake.").)  In fact, Eimers did not even consult Lindsay before filing this motion, and Lindsay represents that it would have been willing to clarify misunderstandings of the production and produce the unredacted documents where appropriate.  (Doc. 346, at 1.)  Accordingly, there is no basis for the Court to impose sanctions for spoliation, and Eimers's motion is **DENIED.**

## II.     EIMERS'S MOTIONS IN LIMINE (Docs. 330–32)

Eimers filed three motions in limine, and the first consists of three subparts.  (Docs. 330–32.)  Counsel for Lindsay represented at the final pretrial conference that it does not oppose the Section A of Eimers's first motion in limine—which seeks to "preclude testimony about the FHWA [Federal Highway Administration] or TDOT [Tennessee Department of Transportation] that will not assist the jury."  (Doc. 330, at 2.)  Therefore, the motion (Doc. 330) is **GRANTED IN PART** as to that section.  For the reasons set forth at the final pretrial conference, Eimers's first motion in limine (Doc. 330) is **DENIED IN PART** as to the remaining sections, which seek to bar any reference to the NCHRP 350 as a "safety standard" and any arguments that the X-LITE was not expected to perform in conditions outside of the parameters of the NCHRP 350, respectively.  *See* Tenn. Code Ann. § 29-39-104(a) (addressing effect of compliance "with any *federal or state statute or administrative regulation*" (emphasis added)).

Eimers's second motion in limine seeks to exclude testimony and evidence speculating about why Hannah Eimers's car left the roadway. (Doc. 331.) At the final pretrial conference, the Court found there to be sufficient circumstantial evidence that a reasonable jury could infer that Hannah Eimers may have left the roadway because she fell asleep. Accordingly, this motion (Doc. 331) is **DENIED**. However, hearsay evidence, theories about why her car left the roadway that have no circumstantial evidence in support, and any argument that there is *direct* evidence to support the notion that Hannah Eimers fell asleep while driving are likely inappropriate, and the parties may raise objections to such at trial.

Eimers's third motion in limine (Doc. 332) seeks to exclude "unhelpful or irrelevant evidence." The Court notes that "[o]rders in limine which exclude broad categories of evidence should rarely be employed. A better practice is to deal with questions of admissibility of evidence as they arise." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). Rather than asking the Court to enter a motion in limine barring such a broad, amorphous category of evidence, the parties should instead make objections to relevance at trial so they "may be resolved in proper context." *Bouchard v. Am. Home Prod. Corp.*, 213 F. Supp. 2d 802, 810 (N.D. Ohio 2002). For this reason, and the reasons discussed at the final pretrial conference, Eimers's third motion in limine (Doc. 332) is also **DENIED**.

### III. LINDSAY'S MOTION IN LIMINE (Doc. 329)

Lindsay's motion in limine consists of thirty subparts. (Doc. 329.)

#### A. Limit Stephen Eimers' Testimony and To Answer Question as Asked

For the reasons set forth at the final pretrial conference, this section of Lindsay's motion in limine (Doc. 329) is **DENIED**. The Court will hear objections as appropriate at trial.

4

**B.    Preclude Reference to Lindsay's Revenue Profits and Related Evidence**

Eimers does not oppose this section of Lindsay's motion in limine.  Therefore, the motion is **GRANTED** as to this section.  This ruling is limited to the first phase of trial and does not apply to any punitive-damages phase.

**C.    Preclude Any Reference to or Evidence of Installation Issues**

Lindsay argues that the Court should prevent Eimers from presenting any evidence that the subject guardrail was improperly installed because "Plaintiff and his experts admitted that installation error is a non-issue in this case."  (Doc. 329, at 3.)  To support this contention, Lindsay cites to Eimers's response to a request for admission made by Reynolds Fence & Guardrail, Inc. ("Reynolds"), the installer of the subject guardrail and former party to this lawsuit.  (*See id.*)  The request for admission states "Admit that you have no facts or evidence indicating that Reynolds negligently installed the X-Lite."  (Doc. 329-4, at 4.)  Eimers's response states:  "In reliance on the manufacturer's (Lindsay) representation in depositions, discovery, and expert witness disclosures that it does not contend that Reynolds was negligent in this case, admit."  (*Id.*)  However, just because Eimers admitted Reynolds was not negligent does not mean he admits there were no installation defects—only that those defects were attributable to Lindsay's negligent design, installation instructions, and training, rather than any negligence by Reynolds in attempting to follow those instructions.  Lindsay also cites to Eimers's experts Marthinus van Schoor and Kevin Schrum's depositions in which they state they are not aware of any installation issues.  (Doc. 329, at 4.)  Statements by Eimers's experts that they were unaware of any installation issues does not amount to a party admission that there were no issues.

Indeed, there is evidence of installation issues in the record.  On the same day as Hannah Eimers's collision, Lindsay sent its regional sales manager, Steven Garren, to assess the crash

site. Garren wrote a report[1] at the scene after examining the subject guardrail, noting that "post 1 broke at crimp location, was holed post, splice bolt and nut connected post to GR *vs. slotted post and square washer which is required*. Post 3 was the old style slots and holed post, slot was used to attach GR *which is not correct for this post location*." (Doc. 344-2, at 2 (emphasis added).) Lindsay argued at the final pretrial conference, that even if this report includes evidence of installation issues, it is nonetheless irrelevant because Eimers has no evidence to support that these specific errors caused or contributed to Hannah Eimers's injuries.

However, there is evidence in the record from which a reasonable jury could conclude that installation issues contributed to the subject guardrail's inability to adequately absorb the energy from Hannah Eimers's collision. Dr. van Schoor reviewed crash tests of the X-LITE to develop his expert opinions. (Doc. 224-3, at 34.) Lindsay made a design modification, adding a slot to the downstream side of post three, before conducting the XTL09 crash test. (*Id.*) During this test, the "guardrail panels buckled, and the vehicle passed behind the installation. However, . . . due to the buckling of the guardrail, the vehicle was potentially exposed to [an] unprotected w-beam, this should have cause concern to the developers." (*Id.*) This crash test failed after the addition of a slot at post three, and Garren noted that the subject guardrail included improper "old style" slots at post three, and a slot was used to attach the guardrail to the post. (*Id.*; Doc. 344-2, at 2.) The jury could conclude, with the benefit of expert testimony on the matter, that the installation contributed to the failure of the subject guardrail to absorb sufficient energy.

---

[1] This document is nonhearsay under Federal Rule of Evidence 801(d)(2)(D) which provides that an out-of-court statement offered for the truth of the matter asserts is admissible when it is "offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . . ." Fed. R. Evid. 801(d)(2).

This is true even though the guardrail did not "buckle" in this case as it did in the XLT09 crash-test. While he did not address these specific installation issues, Dr. Schrum articulated how the energy-absorption mechanism of the X-LITE is supposed to work and that unsecured bolts in the guardrail system can result in the energy absorption being reduced or eliminated. He explains the energy-absorption mechanism as follows: "The basic principle of the X-Lite is its telescoping action. Upon impact, the first panel of rail moves with the vehicle while the second panel remains stationary. The two panels are connected by a bracket that is supposed to induce contact. This contact, during telescoping, would generate friction." (Doc. 223-1, at 102.) This process repeats until the vehicle reaches the end of the guardrail—the more friction generated, through consistent contact between the panels, the more of the collision's energy is absorbed and released. (*See id.*) Dr. Schrum explains that bolted connections, at various points of the guardrail system, are what keep the panels in contact, generating the necessary friction. (*See id.* at 106 (discussing the bolted connection at the impact head) ("The greater the distance [between columns of bolts], the larger the capacity [to transfer force in the joints]. Therefore, the single column in the X-Lite impact plate connection is very weak any time there is an applied moment about the horizontal axis, perpendicular to the guardrail. As is commonly observed in the real world, this bolted connection fails frequently, leading to a complete separation of the impact place from the terminal. When this happens, the energy absorption stops.").) He further opines that if these bolted connections are not securely and properly attached, they can allow too much room between the guardrails so they do not maintain constant contact—friction generation and energy absorption are thereby reduced. (*See* Doc. 223-1, at 106–107.) While the particular connections Dr. Schrum addresses are not those improperly installed connections that Garren reported, it is within the scope of Dr. Schrum's expert report to opine on the *mechanism* by

which the failed connections lead to reduced friction and energy absorption. (*See id.*) Therefore, relying on Dr. Schrum's anticipated testimony, and even though the subject guardrail did not buckle or fail to telescope in this case, a reasonable jury could find that installation issues in the bolted connections allowed too much room between guardrails, reducing the friction and thus not absorbing enough energy to bring Hannah Eimers's vehicle to a safe stop. Accordingly, Eimers has presented sufficient evidence to render installation issues relevant to this particular collision, so Lindsay's motion in limine is **DENIED** as to this section.

This ruling should not be construed to mean that detailed evidence of installation issues in X-LITE installations throughout the country is admissible. Eimers is expected to introduce evidence from Lindsay's internal audit that there were installation errors in seventy to ninety percent of X-LITE installations. (Doc. 344, at 5.) The fact of frequent installation issues, many differing versions of installation manuals, and poor training of installers has some probative value to support the inference that Lindsay's negligence caused installation issues, such as those identified by Garren, in this case. However, the more detailed this evidence becomes, the higher the risk it runs of unfairly prejudicing the jury against Lindsay for other wrongdoings that have no causal link to Hannah Eimers's injuries *in this collision*. The danger of unfair prejudice caused by the introduction of details of issues on X-LITE installations that are *not* the subject guardrail may substantially outweigh any probative value they have in this case. *See* Fed. R. Evid. 403. The Court will entertain objections at trial as appropriate.

### D.     Preclude Dissimilar Accidents and Impacts Post-Dating the Eimers Crash

Lindsay argues that Eimers should be precluded from presenting evidence of any impact involving an X-LITE guardrail system that is not substantially similar to Hannah Eimers's collision, in particular, any impact that occurred at a location other than the side of the vehicle.

8

(Doc. 329, at 5–7.)  Dr. Schrum used the following criteria to determine whether an impact was

substantially similar to reference for his expert report:

1. The subject terminal must be an X-Lite.
2. The subject vehicle is part of the foreseeable vehicle fleet.
3. The speed and/or energy of the subject crash is within expected highway operating conditions
4. Any portion of the terminal or guardrail system passes into the vehicle or causes intrusion into the occupant compartment.

(Doc. 223-1, at 112.)  Lindsay argues that none of the incidents on which Dr. Schrum and

Eimers's other experts relied were substantially similar because "not one of Plaintiff's OSIs

involved a side-impact—let alone a side impact with the driver's side door at an excessive

speed."  (Doc. 329, at 6.)  The "other similar incidents" ("OSIs") Dr. Schrum used are front

bumper or front corner collisions, and eight of them are on the passenger side—near the same

location as the impact in Hannah Eimers's collision, though not precisely the same angle.  (Doc.

223-1, at 115.)  The substantial-similarity rule is just an interpretation of the relevance rule—if

an accident is not similar, it is not relevant.  *See Surles ex rel. Johnson v. Greyhound Lines, Inc.*,

474 F.3d 288, 297 (6th Cir. 2007) (internal citations omitted)  ("Only prior incidents that are

'substantially similar' to the one at issue will be admissible in evidence.  This is so in large part

because all evidence deemed admissible by the district court must meet the minimal standards of

relevancy articulated in Federal Rules of Evidence 401 and 403.")  "The Federal Rules of

Evidence set a low bar for relevance."  *Cambio Health Sols., LLC v. Reardon*, 234 F. App'x 331,

338 (6th Cir. 2007).  Because of the low bar to establish relevance, the requirement that incidents

be substantially similar to be admissible is not onerous and does not require that the collisions be

the same.  *See John Gerber Co. v. Smith*, 150 Tenn. 255, 263 S.W. 974, 977 (1924) (reversing a

Court of Civil Appeals decision finding other slip-and-fall incidents to be inadmissible as not

substantially similar where the incidents occurred on the same floor, but plaintiff was walking

straight, did not wear high heels, and encountered no protruding nails, while those conditions existed in the other similar incidents) ("[W]e think this view is hypercritical, and, if sound, would result in the exclusion of such evidence in practically every case. It was only necessary to show that the condition of the floor was substantially the same when other persons slipped and fell upon it.").

The Court finds that the criteria Eimers and his experts have used to determine substantial similarity are sufficient to render the other collisions relevant and admissible. It is more appropriate for Lindsay's counsel to attack the weight of this evidence on cross examination than to bar the evidence from the jury's consideration entirely based on relevance. *See Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Accordingly, Lindsay's motion in limine (Doc. 329) is **DENIED** as to this section. The Court also finds that convening a gatekeeper hearing to determine the relevance of this evidence is unnecessary, so Lindsay's request for such a hearing is also **DENIED**.

### E. Preclude Photographs of the Decedent After Impact

Eimers does not oppose this section of Lindsay's motion in limine. Therefore, the motion (Doc. 329) is **GRANTED** as to this section. The Court will entertain particular objections at trial.

### F. Preclude Any News Stories or Press Coverage on X-LITE

For the reasons set forth at the final pretrial conference, this section of Lindsay's motion in limine (Doc. 329) is **DENIED**. The Court will entertain objections as appropriate at trial.

**G.** **Preclude Argument Regarding Removal of X-LITE from QPL and/or Roads**

Lindsay argues that the Court should preclude Eimers from presenting any evidence that TDOT removed the X-LITE from its Qualified Products List ("QPL") and/or highway systems under Federal Rules of Evidence 401 and 403. (Doc. 329, at 9.) Eimers contends that the evidence will be relevant to impeach Lindsay's argument that it met the standard of care of a reasonable manufacturer in submitting for, obtaining, and maintaining approval from TDOT. (*See* Doc. 344, at 8–9.) The Court finds that, should Lindsay rely on such an argument, evidence that TDOT removed the X-LITE from the QPL for safety concerns would likely be relevant and admissible. At the final pretrial conference, counsel for Lindsay represented that the removal argument should still be excluded because Eimers has no admissible evidence that TDOT's removal of the X-LITE from the QPL had anything to do with safety concerns or design defects. Counsel for Eimers, on the other hand, represented that they do have such evidence, namely, a letter signed by TDOT Commissioner John C. Schroer to the Division Administrator for this FHWA ("the Schroer Letter"). (*See* Doc. 329-17.)

Relevant portions of the Schroer Letter read:

In June, 2016, TDOT's field staff expressed concerns to our Headquarters Construction Division regarding installations of X-Liet terminals involved two (2) crashes resulting in three (3) fatalities where the guardrail penetrated the vehicle cabin. Between July and October, 2016, TDOT staff conducted field inspections and had discussions with Lindsey [sic] Transportation Solutions executives and staff several times attempting to clarify guardrail end terminal installation details. Lindsey [sic] Transportation Solutions was unable to resolve our concerns regarding a lack of bolt torque specifications in their installation instructions. We note that FHWA's September 9, 2011 acceptance letter regarding the X-Lite Terminal, under the standard provisions of acceptance, that "the manufacturer is expected to supply potential users with sufficient information on design and installation requirements to ensure proper performance."

TDOT concluded that unclear instructions may cause installations deficiencies, which could result in the terminal performing differently from the original tested conditions.

11

As a result of unclear installation instructions, and TDOT's migration to the 2016 edition of AASHTO's Manual for Assessing Safety Hardware (MASH), the X-Lite (TX) Terminal was removed from TDOT's QPL on October 25, 2016. Additionally, our experience with the X-Lite Terminals has revealed in-service performance that we believe does not provide adequate protection of motorists on our network of roads. Our concern is based on crashes where we have observed the impact head of the unit separating horizontally from the adjacent w-beam guardrail, sliding past the adjacent section of w-beam which then could and has penetrated a vehicle cabin. Since the end terminal was removed from our QPL, two (2) additional crashes resulting in fatalities and other non-fatality crashes have prompted TDOT to take further action.

We have made the decision to remove installed X-Lite (TX) terminals from the state highway systems through contracts in our March 31, 2017 bid letting.

(Doc. 329-17, at 2–3.)

Eimers seeks to introduce this letter for the truth of the matters asserted therein—that TDOT removed the X-LITE due to installation issues, Lindsay's obfuscation of information, and in-service performance concerns. Eimers argues the letter is admissible under the public records exception to the hearsay rule because it is a statement of a public office, and sets out some of the office's activities. Fed. R. Evid. 403(8). Counsel for Eimers also represented that they should be able to properly authenticate the document, because Paul Degges, who testified that he ghost-wrote the Schroer Letter, is expected to testify at trial. Nonetheless, the Court has concerns statements in the letter will raise hearsay issues if Degges wrote portions of it based on the statements of others rather than on his personal knowledge. It is not appropriate for the Court to rule on the admissibility of this letter in its entirety before hearing Degges's testimony and understanding the purposes for which counsel will seek to use this evidence. *See Sperberg*, 519 F.2d at 712. Therefore, Lindsay's motion in limine (Doc. 329) is **DENIED** as to this section, but the Court will entertain objections made at trial.

12

**H.     Preclude Plaintiff's Counsel from Making "Reptile Theory" Arguments**

For the reasons set forth at the final pretrial conference, this section of Lindsay's motion in limine (Doc. 329) is **DENIED**.  Lindsay may raise any objection under the Federal Rules of Evidence at trial.

**I.     Preclude Any Reference to "Fraud" By Armorflex/Lindsay During X-LITE Submission Process**

Counsel for Eimers represented to the Court at the final pretrial conference that they would not characterize statements made during the submission process as "fraud" or "misrepresentation," nor would they attempt to assert a legal claim for fraud.  However, they still intend to introduce evidence that Armorflex and Lindsay made design changes to the X-LITE system during and after the submission process to the FHWA.  Lindsay claims that any and all design changes are irrelevant because they had nothing to do with the defect of energy absorption.  Given the number of design changes, and the expert testimony Eimers has presented regarding the different design aspects which can contribute to poor energy absorption, it is not appropriate to exclude this evidence on a motion in limine.  *See Sperberg*, 519 F.2d at 712. Rather, the Court will entertain objections at trial as Eimers seeks to introduce this evidence, and where appropriate, require Eimers to lay a foundation to establish that a design change impacted the system's energy absorption.

**J.     Preclude Argument That X-LITE was "Developed" in 10 Weeks or "Rushed" to Approval**

For the reasons set forth at the final pretrial conference, this section of Lindsay's motion in limine (Doc. 329) is **DENIED**.

### K. Preclude Any Reference to Other Lawsuits Against Lindsay

Eimers does not oppose this section of Lindsay's motion in limine. Therefore, the motion is **GRANTED** as to this section.

### L. Preclude Any Requests that Jurors "Send a Message"

Lindsay moved to prevent counsel from making any statements that exhort jurors to "send a message" with their verdict during the liability phase of the trial. (Doc. 329, at 14.) "[S]tatements to the jury suggesting it should 'send a message' to Defendants could be highly prejudicial. Pleas for the jury to send a message often become an 'improper distraction from the jury's sworn duty to reach a fair, honest and just verdict.' These types of arguments are disfavored in this circuit." *Locke v. Swift Transportation Co. of Arizona, LLC*, No. 5:18-CV-00119-TBR, 2019 WL 6037666, at *2 (W.D. Ky. Nov. 14, 2019) (internal citation omitted) (quoting *Strickland v. Owens Corning*, 142 F.3d 353, 358-359 (6th Cir. 1998)).

Despite the fact that courts in this circuit routinely exclude "send a message" arguments, counsel for Eimers represented at the final pretrial conference that this argument is nonetheless appropriate during the liability of phase of trial because it goes to the issue of gross negligence. In Tennessee, "[t]o successfully assert a gross negligence claim, the party must 'prov[e] that the defendant has committed a negligent act' and 'must prove that the act was done with utter unconcern for the safety of others, or one done with such a reckless disregard for the rights of others that a conscious indifference to consequences is implied in law.'" *Spearman v. Shelby Cnty. Bd. of Educ.*, 637 S.W.3d 719, 736–37 (Tenn. Ct. App. 2021), *appeal denied* (May 14, 2021) (internal quotation marks omitted) (quoting *Thrasher v. Riverbend Stables*, No. M2007-01237-COA-R3-CV, 2008 WL 2165194, at *5 (Tenn. Ct. App. May 21, 2008)). The Court finds that even in proving gross negligence, exhorting the jury to "send a message" runs the risk of

14

unfair prejudice against Lindsay. Such a statement encourages the jury to decide a gross-negligence verdict based on a potential deterrent effect for Lindsay and other corporations rather than on the *evidence* of Lindsay's actions. Eimers can argue that Lindsay acted with utter disregard for the safety of others based on the evidence he presents at trial and the inferences that a reasonable jury can draw therefrom without asking the jury to use their verdict to send a message. Accordingly, Lindsay's motion is **GRANTED** as to this section.

### M. Preclude Evidence or Argument of Alternative Devices

For the reasons set forth at the final pretrial conference, this section of Lindsay's motion in limine (Doc. 329) is **DENIED**.

### N. Preclude Any References to Discovery Disputes

For the reasons set forth at the final pretrial conference, this section of Lindsay's motion in limine (Doc. 329) is **GRANTED**.

### O. Preclude Reference to PR/Lobbying Efforts by Lindsay

Eimers does not oppose this section of Lindsay's motion in limine. (*See* Doc. 344, at 15.) Therefore, the motion (Doc. 329) is **GRANTED** as to this section.

### P. Preclude Any Claim that Lindsay "Chose Profits Over Safety"

For the reasons set forth at the final pretrial conference, this section of Lindsay's motion in limine (Doc. 329) is **DENIED**.

### Q. Preclude Any Requests that Jurors "Send a Message"

Eimers does not oppose this section of Lindsay's motion in limine. (*See* Doc. 344, at 15.) Therefore, the motion (Doc. 329) is **GRANTED** as to this section.

**R.      Preclude Reference to Unidentified Crashes Cited in TDOT Letter to FHWA**

Counsel for Eimers represented at the final pretrial conference that they have no intention of attempting to admit evidence of these crashes, other than seeking to introduce the Schroer Letter as an exhibit in which these crashes are mentioned.  The Court addressed the admissibility of the Schroer Letter in Section III.G., *supra*, and concluded that it would be inappropriate to grant a motion in limine excluding this evidence before determining the precise questions of hearsay-within-hearsay and the purposes for which Eimers seeks to introduce it at trial.  However, even if the Court determines the Schroer Letter to be admissible on other grounds, the portion referencing the unidentified crashes is not reliable and runs the risk of jury confusion, because Degges has testified he does not know to what crashes he was referring when he wrote that portion of the letter.  Accordingly, this section of Lindsay's motion in limine (Doc. 329) will be **GRANTED**, and Eimers must redact the references to these two crashes should the Court admit the Schroer Letter as an exhibit.

**S.      Preclude Reference to TDOT "Concerns" Regarding Shear Bolt Torque**

Eimers has presented no evidence suggesting that the shear bolts in this case were improperly torqued at installation.  The only evidence of installation defects on the subject guardrail are those contained in Garren's report.  *See* Section III.C., *supra*.  This report did not suggest there was any issue with the bolt torquing on the subject guardrail.  (Doc. 344-2, at 2–3.)  Eimers argues that "the evidence will show that the shear bolts—including their torque and the way they were manufactured—were one of the most prevalent defects with X-Lite installations." (Doc. 344, at 16.)  This may be the case, but the only relevant defects are those with a causal link to the injuries Hannah Eimers sustained in *this* collision with *this* guardrail installation, and

16

Eimers has presented no evidence connecting bolt-torque issues with this crash.  Therefore, Lindsay's motion (Doc. 329) will be **GRANTED** as to this section.

**T.       Preclude Statements Regarding Fraud of TDOT**

At the final pretrial conference, counsel for Eimers represented that the evidence they seek to use to support this contention is contained in the Schroer Letter.  The Court addressed the admissibility of the Schroer Letter in Section III.G., *supra*, and concluded that it would be inappropriate to grant a motion in limine excluding this evidence before determining the precise questions of hearsay-within-hearsay and the purposes for which Eimers seeks to introduce it at trial.  Accordingly, this section of Lindsay's motion in limine (Doc. 329) will also be **DENIED**, but the Court will entertain objections on this matter at trial.

**U.       Preclude Any Witness, Including Experts, From Speculating on Lindsay's Intent or Motive to "Put Profits Over Safety"**

For the reasons set forth at the final pretrial conference, this section of Lindsay's motion in limine (Doc. 329) is **GRANTED**.

**V.       Preclude Argument that the X-LITE is "Four Times More Dangerous Than ET-Plus"**

Eimers does not oppose this section of Lindsay's motion in limine.  (*See* Doc. 344, at 17.) Therefore, the motion (Doc. 329) is **GRANTED** as to this section.

**W.      Preclude Testimony that RSI Submitted "Failed" Tests**

The Court has found that Lindsay is not entitled to the rebuttable presumption under Tennessee law that the X-LITE was not unreasonably dangerous on the basis that it complied with "any federal or state statute or administrative regulation existing at the time a product was manufactured and prescribing standards for design . . . ," because the NCHRP 350 was never promulgated in any regulation, and Lindsay has not shown it complied with any other such

regulation. (*Cf.* Doc. 349; Section II, *supra*.) Because Lindsay is not entitled to the presumption, the general definition of "unreasonably dangerous" applies—"that the product because of its dangerous condition would not be put on the market by a *reasonably prudent manufacturer* or seller, assuming that the manufacturer or seller knew of its dangerous condition." Tenn. Code Ann. § 29-28-102(8) (emphasis added). The evidence at issue in this section of Lindsay's motion in limine is testimony from Eimers's expert, Dr. Dean Sicking, that RSI, the manufacturer of a competing guardrail system, submitted failed test results to the FHWA during the approval process:

> Q: Was that test [the failure] provided to the FHWA in the documents seeking SKT's eligibility under the guideline?
>
> A: Yes.
>
> Q: . . . What did you provide in terms of that fail test?
>
> A: I believe we – I know we provided a test report on it, a detailed test report, and I'm pretty sure we provided videos and pictures as well.

(Doc. 329-14, at 4.) This evidence is probative of what a "reasonably prudent manufacturer" of a guardrail system would do in the process of bringing its product to market and is therefore relevant to the inquiry of whether the X-LITE was unreasonably dangerous. *See* Tenn. Code Ann. § 29-28-102(8). Lindsay argues that it should also be excluded as unreliable because Dr. Sicking stated he is "pretty sure" but not "sure." (Doc. 329, at 21.) This argument misconstrues the testimony. Dr. Sicking testified he "know[s]" that RSI provided a detailed test report—he was only "pretty sure" that it included videos and pictures as well. (Doc. 329-14, at 4.) Therefore, the testimony that RSI provided information to the FHWA on a failed crash test is sufficiently reliable to be admissible. Accordingly, Lindsay's motion in limine (Doc. 329) is **DENIED** as to this section.

18

### X.  Preclude Invocation of "Golden Rule"

At the final pretrial conference, counsel for both sides indicated that they have no intention to invoke "golden rule" arguments.  Therefore, the motion (Doc. 329) is **DENIED AS MOOT** as to this section, but the parties may raise objections at trial should such arguments arise.

### Y.  Preclude the Introduction of Insurance Coverage

Eimers does not oppose this section of Lindsay's motion in limine.  (*See* Doc. 344, at 18.) Therefore, the motion (Doc. 329) is **GRANTED** as to this section.

### Z.  Preclude Evidence of Plaintiff's Grief, Anguish, Etc.

For the reasons set forth at the final pretrial conference, this section of Lindsay's motion in limine (Doc. 329) is **GRANTED**.  As discussed at the final pretrial conference, this ruling should not be read to limit Eimers's ability to present evidence relevant to his loss-of-consortium claim.

### AA.  Preclude Assertions of Ms. Eimers's Alleged Pain & Suffering

At the final pretrial conference, counsel for Eimers represented that the only evidence they expect to present regarding Hannah Eimers's pain and suffering during collision is testimony from her passenger, Rachelle Kania, that Hannah screamed either shortly before or during the crash.  It was not clear from these representations whether Kania's testimony will state that the screaming continued after impact or, as consistent with her injuries, that the screaming stopped on impact and her death was instantaneous.  Accordingly, the Court **ORDERED** Eimers to provide the Court with a notice of the specific testimony Kania is expected to give with respect to Hannah Eimers's pain and suffering no later than **June 7, 2022**. Accordingly, the Court **RESERVES RULING** on this section of Lindsay's motion in limine.

19

### BB.    Preclude Any Testifying Witnesses and Expert Opinions Not Timely Disclosed

Eimers does not oppose this section of Lindsay's motion in limine.  (*See* Doc. 344, at 18.)

Therefore, the motion (Doc. 329) is **GRANTED** as to this section.

### CC.    Preclude Any Reference to New Zealand Transit Authority

Lindsay argues that Eimers should not be allowed to introduce evidence that the New

Zealand Transit Agency ("NZTA") refused to allow the X-LITE to be installed on the state

highway network in New Zealand.  (Doc. 329, at 24.)  Eimers argues that he has presented

relevant evidence on this matter because a 2021 letter sent from NZTA to Eimers states that the

X-LITE's interim acceptance for use in New Zealand "was later rescinded due to defects

identified by the designer."  (Doc. 344, at 19; Doc. 344-5, at 2.)  In other words, Eimers would

offer the letter from NZTA, an out of court statement, to prove the truth of the matter asserted

therein—that the X-LITE designer identified defects in the product.  Eimers has not shown that

this letter falls into any hearsay exception so as to render it admissible.  Even assuming that the

letter is admissible under a hearsay exception, any discussion of the NZTA product-approval

process is inadmissible under Federal Rule of Evidence 403.  There is very little evidence about

the approval process for highway safety products in New Zealand, there is little detail in the

letter about the specifics of the X-LITE's rejection, there is no information about the timing of

the rejection, and this is a tangential issue far afield from the facts of Hannah Eimers's collision.

(*See* Doc. 344-5, at 2.)  Accordingly, Lindsay's motion in limine (Doc. 329) is **GRANTED** as to

this section.

### DD.    Preclude Evidence/Argument Not Relevant to Plaintiff's Remaining Claims

For the reasons set forth at the final pretrial conference, this section of Lindsay's motion

in limine (Doc. 329) is **DENIED**.  *See Sperberg*, 519 F.2d at 712.

## IV. PROPOSED PRETRIAL ORDER, STIPULATIONS, AND OBJECTIONS

The parties are also **ORDERED** to submit an agreed proposed pretrial order, to stipulate as to the admissibility of exhibits where possible, exchange any demonstrative exhibits with one another, and to enumerate their objections to exhibits no later than **Tuesday, June 7, 2022.** The Court notes that Eimers's exhibit list—not the exhibits themselves, just the list—spans over 150 pages, listing 1,210 individual exhibits. (Doc. 355.) The circumstances of this case do not suggest that the introduction of such an overwhelming number of exhibits is necessary or reasonable. Eimers should carefully review his exhibits for relevance, needlessly cumulative evidence, and potential for wasting time, to enable the Court to use the jury's time most efficiently to resolve the real issues of this case.

SO ORDERED.

/s/ *Travis R. McDonough*
**TRAVIS R. McDONOUGH**
**UNITED STATES DISTRICT JUDGE**